24-2888 and 25-1355 and we'll hear from Mr. Anderson. May it please this Honorable Court. First off, do you want to reserve some time? Yes, I would like to reserve two minutes for rebuttal. That'll be granted. May it please this Honorable Court, my name is Tom Anderson and I represent Patricia Holmes and I was trial counsel in this case. I'm sure we can all agree that malicious racial discrimination in the workplace cannot be described as anything short of despicable, socially unacceptable, and legally intolerable. The slurs used by Tim McCoy were ugly and dehumanizing. Referring to them even here by their first letter doesn't do justice to what was proven, what was said, and what the jury relied upon to determine the appropriate amount of punitive damages. Even Tim McCoy admitted that the slurs he used in the workplace contained historical racial bigotry and hatred baked into them. An example of the scars that racial discrimination can cause, I think, are demonstrated by the Clark Doll test that was used to or played a role in eliminating the insane separate but equal doctrine. That test, which was recreated in 2021, revealed that racial discrimination can cause black people to experience deep seated self-loathing and feeling very negative feelings about themselves. And this indisputably occurred. Here, Patricia Holmes, supervisor, laughed in her face and as he mocked her and compared her to a black person being forced to don a Klansman's outfit. That's McCoy, right? I'm sorry. McCoy. Is there an issue about his, the respondents for your question, is that at all an issue? It is not, your honor, and here's why. Tim McCoy was the only supervisor in this office. Tim McCoy was appointed by American Home Patient through its anti-discrimination policy to be the person who was to prevent racial discrimination and harassment. Yes, that's in the handbook and he admitted that he failed to do so in this case during his testimony when I Sure. Of punitive to compensatory damage, 20 to 1 was struck down and you may not be willing to agree with it, but 20 to 1, given the jurisprudence, does seem way, way out of the ballpark. Your friend is arguing 1 to 1, which at least to me, we haven't discussed the case, to me only seems also way out of the ballpark. So how do we get a handle on an appropriate punitive to compensatory ratio here that is consistent with constitutional limitations? Sure, well that's assuming I think that you've already decided that the reprehensibility issue with is the most important, but dealing with the ratio, I think that racial discrimination is actually one of the few situations, because it has been determined to be such an evil that we have been trying to eliminate since after the Civil War, that is one of those few cases that the Supreme Court has identified that would justify an award, not only a substantial award, but one that exceeds to even a significant degree, given the the reprehensibility, a single-digit ratio. Now, in direct response to your question... What about Zhang's Ninth Circuit? It's ethnic, it's not racial, but the the ratio there I think was 9 to 1 in Zhang? 9 to 1 in Zhang, yes, and I think that's because that's been the the safe go-to because of this language in State Farm, that a 9 to 1 ratio unequivocally is certainly constitutional. The same occurred two months ago, the Eleventh Circuit approved a 9 to 1 or an 8 to 1 ratio there, but that's what the jury verdict was. It was a three million to three hundred ninety thousand, and because of the reprehensibility, they said that they had would have had no problem that even going above that to a 9.2 or above, as they did in Goldsmith, another... Your comments are well taken, but what about the Title VII cap on civil liability? Doesn't that inform us? It does not inform you, and here's why. Number one, that's 30 years... Well, it's 30 years old first, to begin with, and hasn't changed since it was put in place, and additionally, courts have routinely held, and noted, as did the Eleventh Circuit just two months ago in the Fulk case, that Congress has routinely decided we're not going to include in Section 1981 the statute that in and of itself was just meant to deal with the badges and incidents of slavery, and it's different than Title VII, and the courts have routinely said that is the most minimal comparator, and have decided routinely not to apply that cap of Title VII, which includes all sorts of different kinds of discrimination, as opposed to racial discrimination under Section 1981, and I think that's imperative. Again, Judge McKee, to address your concern about the ratio, the Third Circuit in December of 2024 in Washington v. Gilmer approved a 10 to 1 ratio there because of the reprehensibility. And there, I think, it was just pennies over the line from 9.99999 to 10. It was, but again, I would suggest to you that given the reprehensibility of what occurred in this case, and the fact that Patricia Holmes testified, told this jury, that what happened to her convinced her that her boss thought of her as nothing short of a nigger who should be mocked and laughed at, and that caused her to change the way she dealt with white people. No, that's under reprehensibility, and at least to my mind, there's no issue about whether or not the contract was... I agree with you wholeheartedly. But Washington, I mean, the situation there was so, as bad as this was, Washington was worse, if you can imagine such a thing, because of the repeated sodomizing, I say beat it twice, of a person over which prison guards had total control. It was really a horrendous situation. In fact, one could easily argue that that ten percent figure there is way, way, way too low, given what happened. I would, and I think, again, this, unfortunately, despite the fact that the Supreme Court said in State Farm that there are some exceptions to this general idea that a single-digit ratio is, at times, it's the rule of thumb. As this court has said, it's the rule of thumb. The question is, is there justifiable reason to exceed that rule of thumb? And I would agree with you that in Washington v. Gilmore, that is almost akin to torture, and I can't really think of anything that is at the apex of reprehensibility, besides physical type of assault or torture, and racial discrimination, and the kind of racial discrimination that took place in this case. To say that what the position that this company condoned by allowing not only this behavior to occur, these racial slurs that they knew about, and then they did nothing about it at all, and then his conduct changed and became verbally harassing. It caused her to become physically ill. It caused her to be afraid to be alone in the building with him because it became physical, and she wrote to them and told them, I'm going to quit because of all this, a week before she actually left, and they did nothing about it. I think this case screams out to be one of the situations where I don't think any of the justices on the Supreme Court would admonish this Honorable Court for saying this is one of the few situations. I wouldn't want to place money on that bet if I were you. What's that? I wouldn't want to place money on that bet if I were you. Well, I think that, you know, the fact of the matter is, I think that in terms of the reprehensibility here, which is the most important indicia of the reasonableness of the jury and the punitive damage award here, I think that that weighs heavily in favor of exceeding a single-digit ratio, and I would say the other thing... Excuse me, do you still say that Ahom's wealth is something that we ought to consider? Absolutely. The whole purpose of punitive damages is to deter and make an example for others, and it matters what size the company is or who the defendant is. For example, in a case, it would make a difference, for example, if you had an individual defendant who perhaps, you know, didn't have the kind of money that you're dealing with with a company that has a hundred million dollars in assets. We stipulated to that it's part of the standard instructions, and yes, it is necessary to consider or should be considered as part of whether this is reasonable or not. It should be the reprehensibility, the ratio, and whether, in fact, the conduct is grossly disproportional, or I'm sorry, the award is grossly disproportional to the conduct such that would be a constitutional violation. And this is so reprehensible, and when you look at all of these, the situation, and you look at the wealth of the defendant, the conduct that occurred, that it was repeated, that they did nothing about it, and that they have, as the trial court mentioned, they have repeatedly in their... consistently minimized the severity of the conduct here. They don't get it. They didn't get it. And the fact of the matter is, if it's not sufficiently deterred, if we don't say enough, if we don't, if we allow these kinds of situations to go on without having a verdict and a judgment that is sufficiently exemplary, no one's going to change their conduct. I mean, you think about today's society, people have very short attention spans, and sometimes you have to, in order to get their attention, in order for an HR group to write or teach on this kind of thing, it has to be exemplary. I would submit to you that the verdict in Falk is not exemplary, and certainly a two-to-one ratio without the inclusion of attorney's fees on the compensatory side, consistent with this honorable court's ruling in Willow Inn and Gallatin Fuels. Let me ask you, counsel, our court recently issued an opinion in Wexler. Yes. How does that impact this case? In terms of the Wexler decision, how it impacts the case is simply the fact that the conduct there was very different, and there was an individual defendant, which I think goes to Judge Sikora's noting about the the wealth of the defendant. There we had one individual defendant, and as I noted in my letter subsequent to the to the court, the court noted how minimal the injuries were, how modest the evidence was to support the reprehensibility. Look at what happened. Somebody was subjected to incarceration and trumped up charges really for retaliation. She was incarcerated. So it might be just one defendant and not a large corporation like we have here, but the conduct was horrendous. I don't disagree, but that's what the court noted and was the basis of their finding was all this modest basis for reprehensibility. So I don't think that that inhibits here the rule at all, and I've noticed my time is up. I didn't get to address the issue of attorney's fees and the judge's error in that regard. Well, you have three more minutes, so you can do you can deal with it. One question. Yes. Was any evidence put before the jury in terms of the size, the wealth of the defendant? Oh yes, we stipulated that, Your Honor, and the way it worked was I did not mention that at all until we got to the point where the defendant moved as a matter of law to on the punitive damages, and when their motion was denied, at that point we had a stipulation. We stipulated that their total assets were 100 million dollars, was 94 million something or another, and that their annual revenue at that year was 54 million dollars. That was stipulated to read to the jury, so the jury had that to consider, and it was part of the jury instructions of what they should consider. Okay. All right. Thank you, counsel. We'll hear from your friend. Thank you, Your Honor. May it please the court. My name is Michael Keneally, and I represent American Home Patient. The district court correctly concluded that the original punitive damages award of 20 million dollars was unconstitutionally excessive under the three due process guideposts. In particular, the trial judge's view of the evidence and all of the trial and all the events that led up to it led him to conclude that the reprehensibility factors here did not tilt strongly enough in plaintiff's favor to support any award greater than twice the amount of the emotional distress damages. How about the reprehensibility analysis? Because we have a situation where, and I'm not even sure I've seen a case where discrimination tells the victim to take their problem and be counseled by the victimizer. Basically, unless I'm missing something, wasn't she told, wasn't Ms. Holmes told, you got problems, you gotta take them to McCoy. I read that and it started scratching my head, shaking my head. No, Your Honor, and actually this is, I think, very important. Page 2469 of the appendix is the company handbook that includes the... I know what the handbook says, but I'm talking about what they did, not what they said. And it's my understanding, and please correct me if I'm wrong, that after this was reported to Catron, I think it was, who was McCoy's partner in laughter at the whole thing, she was told to, as part of the remedy, to seek counseling from McCoy if this happens again. Well, I obviously said you need a thicker skin. Oh, that was in regard not to any sort of racial comment. That was in regard to a training, a call involving training. And that was directed both to Ms. Holmes and to her colleague, Ms. Dunmire. I think that Ms. Holmes herself was very clear at trial there was nothing racial, racial, after March. And the racial comments from McCoy ended as soon as the company issued the written warning. Well, the comments may have ended. She was denied training opportunities and removed from the employee list, but I don't quite understand what that means. But was she and Herbert removed from the employee list? I'm sorry, Your Honor, was she removed from the employee list? Herbert were removed from the employee list. I'm not sure what that means. But she was denied training opportunity. Basically, she was retaliated against. So she wasn't called a nigger after that, but she wasn't given any opportunity to advance in the company. I don't think that's right, Your Honor. And there was a retaliation claim in the case. Summary judgment was entered in my client's favor. You're denying that she was denied training opportunities? Yes, we do dispute that, Your Honor. And the training that she testified about, it turns out there was no specific training on that. That was what the trial testimony showed. But the written warning that Mr. McCoy received was very clear that retaliation was completely unacceptable. And if it had been known that there was any evidence of retaliation, the company there's no reason to think the company wouldn't have done anything about it. But there were no complaints from Ms. Holmes or anyone else about Mr. McCoy after the written warning was issued to him. And until Ms. Holmes submitted her resignation letter. And that was because McCoy started snatching papers out of her hand, and she became physically afraid to be in the building with him. This papers snatching, there's not a whole lot of testimony about that. But that was the day she submitted her resignation letter. And there were two moments where, according to her testimony, papers were snatched out of her hand. But, you know, that I don't think in and of itself would amount to a hostile work environment or a retaliatory change in the terms and conditions of employment. And I think here the efforts that the company made to convey to Mr. McCoy, who had had no disciplinary problems before, that this behavior was unacceptable, distinguishes this case from the ones like Zhang and also the 11th Circuit case that we submitted 28 J letters about, where the company knew very clearly that its conduct was unlawful. And it went ahead with it anyway. In the 11th Circuit case with the high 10 to 1 multiplier, that company was engaged in an overtly discriminatory hiring practice. Here, we don't have anything like that. And I think McCoy admitted that the language he used, he knew the language he used was inappropriate. Yes, it certainly was. And we're not disputing that. What we're arguing is that under the Supreme Court's Kolstad test for attributing a supervisor's misconduct to a company for purposes of punitive damages in an anti-discrimination claim, that the company's actions are judged based on whether they were engaging in good faith efforts to comply with anti-discrimination laws. And the court... The company, isn't the company here, McCoy, he's the only supervisor on the site, isn't he? He's the only one on the site, Your Honor. Yes. So therefore, his actions have to be the actions of the company. To argue otherwise is to say the company's not there. No, Your Honor, because what his conduct was, was contrary to the company's policies and rules. Company's written policy. Correct. Which he knew about. And he testified that he knew that his conduct or that creating a hostile work environment and similar conduct was against the company's policy. Why he didn't comply with that, I think, shows at least a huge lapse of judgment. Maybe he didn't comply with it because he said he knew that, well, the company says that, but we all know they got to say that stuff, you know, because this work age that we live in, you got to have these policies and all it does is get in the way of us doing our job. I don't think that's a fair inference from the record, Your Honor, because the testimony was that Mr. McCoy had never had any disciplinary problems up until this point. He never supervised a black employee before. That is true. But he had never had any disciplinary problems of any kind that occurred to anybody in the workplace or with customers as well. I think to go back to Your Honor's question about ratios, I'd like to speak to that as well. And I'll be the first to admit that the decisions out there are a little all over the place on ratios and how much to how to interpret the Supreme Court's guidance in this area. It's really, as a former colleague used to say, it's nailing jelly to the wall. I'm sorry, Your Honor. It's nailing jelly to the wall. Yes, that's a fair understanding. I think this court did about as well as it could just recently in April in the Wexler case where it wrestled with this question in the context of, you know, Your Honor's are familiar with the case, a physical altercation with a police officer. And there the court said a four to one ratio would be very hard to justify except for the most outrageous conduct. In that case, it upheld a three to one ratio. And it did so even though the award of compensatory damages there was minuscule. It was four thousand dollars and a twelve thousand dollar punitive damages award was issued. I think here the cases I would point to that seem to be most analogous are especially the Williams versus Conagra case from the Eighth Circuit, where there there was a actually in many ways far worse behavior from the company because it well, it was actually it was actually pretty similar. There was a six million dollar punitive damages award, a six hundred thousand dollar compensatory damages award for a racially hostile work environment. And the Eighth Circuit there concluded that given the substantiality of the six hundred thousand dollars, given the cap in Title seven, which is three hundred thousand dollars for compensatory relief outside of back pay, the court was going to reduce the award there to a one to one ratio. And here I think the district judge really did wrestle with these cases from different circuits. There's not a whole lot of on point precedent from this court in the racial discrimination context. And having sat through the trial, concluded that the reprehensibility factors taken together showed some reprehensibility on the company's part, great reprehensibility on Mr. McCoy's part, of course. And and altogether, given the compensatory damages issued, which were five hundred thousand dollars, a two to one was about it was as high as he thought the record would support. This court has in the past suggested that a trial court's factual findings in this regard are subject to clear error review. And I think that if the court is struggling with how to judge reprehensibility on the facts of the case as a whole, giving significant consideration to the district court's views of the case is an appropriate course. I do think that McCoy still employed this rationale. I am not aware one way or the other, your honor. I know he he may be retired at this point, but I would really be just trial counsel. I'm sorry. Were you trying? I was not trial counsel. I only recently became involved in the case. OK, you got me. Let me ask. I'm sorry. I was going to ask you about about the warning letter your client issued to McCoy. Yes. Did it sanction him for his conduct as opposed to the conduct of what was going on in the environment? I think it did, your honor. I'm looking at twenty four ninety three, which is the letter. And it starts by saying you admitted to initiating a discussion that led to serious racial tension. He admitted that much. And then it goes through that, which I think is mostly, to be fair, referring to Ms. Hibbert's comments. And then it says, as the center manager, you were to set an example for your staff as well as hold them accountable. You were to create and foster an environment. Now, didn't McCoy, McCoy testified, if I'm not mistaken, that he didn't think it applied to him, per se, his actual actions? Well, I think he admitted that it applied to his supervisory actions. I think he did. I read that as him interpreting the letter and I interpreted the same way as him being sanctioned for what Hibbert did under his management. Well, I think the letter goes more broadly than that. He did he did seem to interpret it that way at trial. I'll admit that, your honor. But the letter as a whole does say you are responsible. You engaged in infraction number four, immoral, disorderly, indecent or harassing conduct. I think that it fairly read does apply to his conduct as well. But did Judge Brand read it that way? No, I don't I don't know, but he he read it that way, your honor. Well, because I mean, there is a there is a standard of review that we deal with here. So that that is true, your honor. And my only point there, your honor, is that Judge Brand didn't engage with this court's precedent in the Knobby versus Bowery Corp case. That's another thing. Why does that even apply? Isn't that a liability case? Yes, but it applies, I think, with even greater force and punitive damages, because for punitive damages under Kolstad, the employer's conduct needs to be malicious or in reckless indifference to the plaintiff's rights. And so if it's not even a violation of the plaintiff's rights not to conduct a more thorough investigation, I don't see how it could be recklessly indifferent. But you've conceded liability. So that's not even an issue, right? Correct. Only only thing before you, from our perspective, is the punitive damages award. But again, if if there's case law from this court saying that the law doesn't require you to engage in more thorough investigation or harsher discipline, then it can't be recklessly indifferent to the plaintiff's rights not to engage in a more thorough investigation. Of course, this Knabe case came out before the Farragher Supreme Court decision, too, right? That is correct, your honor. But it also came out before the Kolstad decision. And again, the Kolstad decision suggests that having Title seven policies in place is in itself a long way toward complying with good faith efforts or showing good faith efforts to comply with the law. Ms. Holmes admitted that when she joined the company, she had to undergo training on these policies, as did everyone else. They directed her not to report any misconduct to the perpetrator, Mr. McCoy, but to H.R., to employee relations, to the area manager. And so I don't think it's fair to say that the company didn't provide her a channel for voicing any complaints she had with no concern about retaliation. How about the third the third State Farm guidepost, other civil remedies and particularly Title seven? I asked your friend, how does that how does that work into this, if at all? Well, we agree with the Eighth Circuit in the Williams versus Conagra case that it's at least something to consider. And I would I would circle back to Wexler, which your honor mentioned from this court just a couple of months ago, which talks about that guidepost is providing the notice to defendants about the scope of potential liability for breaking the law. And that at least should be something like a check on the amount of total punitive damages awarded. On the other hand, that's not part of the landscape of 19 section 1981. So it's not directly applicable to 1981. Certainly, your honor. But 1981 cases are often. So that's not a real comparator then in this case then. Well, it's it covers a lot of the same conduct. It certainly covers race discrimination under Title seven. And so it's certainly relevant, I think. Your honor, Judge Sirica, you mentioned you asked about the wealth of the defendant. I would just want to highlight State Farm versus Campbell, where the Supreme Court said that the wealth of the defendant doesn't go to the reprehensibility of the conduct in the usual case. There are cases where a defendant exploits its great resources in order to magnify the harm imposed. But the Supreme Court said that if you're not in that category, we're really not going to look at the wealth of the defendant to see whether the conduct is sufficiently reprehensible under the Due Process Clause to justify a very large award. And the other case. Do you want to just touch on attorney's fees? Because your time's running out.  I only have two quick points to make on that. OK. I think the district judge, I mean, he had a 46 page opinion on attorney's fees. And I think it's very thorough. And I think it correctly applies Third Circuit law. He notes that the prima facie case requirement that this court has recognized. I don't think there's a dispute about how that prima facie case requirement applies here. And he also notes that the standard for the community rate is set by this court's precedent is that you look to the vicinage of the court. And I think that's exactly what he did, Your Honor. So I don't see any basis to overturn his attorney award, attorney fee award. Did you have something? OK. All right. Thank you for your time, Your Honor. Thank you, counsel. And we'll hear rebuttal. Thank you, Your Honor. First, you had it absolutely right in terms of the letter. Tim McCoy unequivocally testified that that letter had nothing to do with his behavior. And there's no issue in terms of the investigation and quality of the investigation. Because the investigation revealed that he had used these racial slurs, done the fit test comparison to the KKK, all of that. And as a matter of fact, Judge Brand found that the company's explanation was not credible for a number of reasons. On the attorney's fees issue, Judge Brand got this completely wrong. We submitted a fee petition, and I attached six affidavits, four from my firm, one from a colleague, Ramage, and one from Clifford Readers, who is an attorney who practices in Williamsport. And Judge Brand said that Mr. Reader's affidavit was extremely long. And it said how my $600 an hour attorney fee was much less than his $750 an hour request that he typically makes. But wasn't that for the Western District? No, he worked. No, he's from Williamsport, and that's in the Middle District. This was in the Williamsport vicinity. He's from Williamsport. Well, I know he's from, but there are two issues. One problem I have is those affidavits from Ramage and Readers were not included in the appendix. I'm not quite sure why. I understand that, Your Honor. For some reason, they weren't attached to the, but they are described in great detail in the opinion. For some reason, the motion was attached, but the actual affidavit wasn't. But his is quoted at length. It is quoted at length, but it was that bad. He had, the district court had a couple of problems. One, the comparative that was used was from the Western District, according to Judge Brand, not from the vicinage here. And there was also an issue of attendance. Part of the basis for the opinion on the reasonableness of the fee was because of attendance at a third circuit conference, I think, in 1985, which, again, I scratched my head a lot. But that had me scratching my head, and I wondered how that could be helpful to determining the reasonableness of the fees. Your Honor, that is a couple of things. Number one, the defendant did not object to any of this. I understand that. Judge Brand said, and Judge Brand says in his memorandum opinion, that typically Mr. Reader's affidavit would be sufficient. But he said, but I find confusing his reference to the use of a contingent fee, but then he charges $750 an hour. Well, the fact of the matter is that's what attorneys in my shoes do all the time, because our clients can't afford to pay us hundreds of thousands of dollars to pursue a racial discrimination case, so we handle them in a contingent fee. But then when we go to the lodestar, we do exactly what we did in this case. And Judge Brand, there is not any evidence whatsoever to support the rates that Judge Brand took it upon himself to say attorneys can only charge this much in his courtroom. Well, help me with this, because you just mentioned something, maybe you can clarify this. The contingent fee plus the hourly fee, is that . . . basically that comes about that if you win, and therefore there is a contingency to pay you. What is paid is therefore not a percentage of the recovery, but is based on an hourly fee. Is that how that works? No. What's a mixture of that? So, for example, in this case, Patricia Holmes and I and our firm have a contingent fee agreement, and whatever we recover, whatever pot of money is at the end of that, falls within that contingent fee agreement. But the way that the Third Circuit, and really all the circuits have set up how you present a petition for fees under Section 1988, is you submit, you go through the lodestar, so you have to go to the hourly rate, but we don't often charge hourly rates. And so that's what Judge Brand says, well, that's what's confusing. Well, you don't do it very often because you're typically doing it on a contingent fee, because clients can't pay. But then when you do have an opportunity to do that, based on your skill and your experience, you charge at whatever rate. We asked for 600, and the rates, all you need to do is take the rates that we requested, use the chart on page 37 of his memorandum opinion, swap the two, and you'll see, when you look, he did not, there's no basis in here to determine how he came up with these new rates. None. He just said, I looked at other cases, and here's what I'm saying. And that was, he overstepped his bounds, particularly in light of the fact that this is really how attorneys handle these fee petitions. Every single day, these affidavits were absolutely enough to establish the burden, and the defendant, again, didn't object to the reasonable hourly rates. They simply shouldn't have been changed, and they should have been included if you don't reinstate the total judgment. They should be included per willow in, on the compensatory side, if you are making any comparison with respect to ratios. Okay, thank you, counsel. We thank counsel for their excellent arguments, both written and today here in court, orally, and we'd ask the court to, the clerk to adjourn. Thank you.